IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

Carlos R. Burnett,

    Petitioner,　　　　　　　　　　No. 2:01:cv-00481-RRB-DAD

 vs.　　　　　　　　　　　　　　　<u>ORDER</u>

Ken Clark, Warden,

    Respondent.
_____/

Petitioner Carlos R. Burnett, a state prisoner, has filed a petition for a writ of habeas corpus with this court pursuant to 28 U.S.C. § 2254(a). For the reasons discussed below, Burnett's petition is DENIED.

**FACTS AND PROCEEDINGS**

In the early morning hours of July 24, 1996, three teenage boys named Feolofan Lopa, Matthew Lene, and Jesse Tooto, started walking to Lene's home in North Sacramento after spending the evening at the home of Lene's aunt. RT 37-43, 73-75. Their journey home took them through the neighborhood of Del Paso Heights.

Del Paso Heights is a large neighborhood in North Sacramento, and Elm Street is located within Del Paso Heights. RT 273. At the time of the events in

1 this case, each of these geographical areas was associated with a specific street
2 gang.  The Del Paso Heights Bloods claimed the Del Paso Heights neighborhood
3 as their territory, and the Elm Street Bloods claimed Elm Street and the associated
4 block as their territory.  RT 275.  The Del Paso Heights and Elm Street Bloods
5 were related gangs, as they were both subsets of the larger Bloods gang.  RT 273-
6 75.

7       The Bloods often engage in violent conflict with the Crips, a rival gang,.
8 RT 274-75.  Both gangs have their own signs, hand signs, and graffiti to identify
9 their members.  *Id*.  They also distinguish themselves from one another by the
10 colors they wear—Crips typically wear blue, and Bloods tend to wear red.  RT
11 273.

12       On the morning of July 24, Lopa was wearing blue clothing.  RT 76-77.
13 The record is not clear whether the three boys belonged to a gang.  Lene testified
14 that he "grew up with a street gang" called the Sons of Samoa, RT 38-39, whose
15 members tended to wear blue, RT 39-40, but he declined to say whether the Sons
16 of Samoa associated themselves with the Crips or Bloods.  RT 39.  Lene also did
17 not address Lopa's or Tooto's involvement with the Sons of Samoa.  RT 38.

18       As the three boys walked together, two African-American males in a gray
19 pickup truck with a camper shell drove slowly past the boys, giving them "hard
20 looks."  RT 76-77.  The driver shortly turned the truck around, parked, and exited
21 the vehicle with the passenger.  RT 43-45, 77.  The driver yelled, "What's up,
22 Bloods?"  RT 45, 77.  The three boys did not respond to the driver's taunt and
23 continued walking.  RT 46, 77.

24       After the two drivers initially passed the three boys and parked the car, Lene
25 was able to briefly look at them after the two men exited the truck.  Lene saw that
26 the driver was a skinny African-American male with braided hair.  RT 48-49.
27 Lene observed that the passenger was a tall, skinny African-American male with
28 little or no hair.  RT 49-50.  Tooto also got a look at the two men as they slowly

1  drove past the boys, giving them "hard looks." He described the driver as an
2  African-American male who was "kind of chubby and stocky" with braided hair.
3  RT 85-86. He described the passenger as a tall, skinny African-American male
4  who was bald or had little hair. RT 87.

5  Suddenly, the truck pulled up behind the boys. RT 50, 79. The passenger
6  shouted, "What's up now, Blood," and then began firing at the boys. RT 50-51,
7  55, 80-81. Lene was hit in his left thigh, RT 56-57, 81-82, and Lopa was shot in
8  the back, RT 58-59. Lopa died from the gunshot wound. RT 258-60.

9  After the incident, Lene participated in a photo line-up at the police station.
10 RT 60-62. Lene was shown ten photos in the photo line-up, and he pointed out
11 two that resembled the shooter, one of whom was Burnett. RT 59-64.

12 After Lene identified Burnett as being the possible shooter, Sharon
13 McClatchy, a detective with the Sacramento City Police Department, interviewed
14 Burnett. RT 247-48, CT 1-48. In that interview, Burnett represented that on the
15 night of the shooting, he and his friend, Omar, drove a gray truck with a camper in
16 the Del Paso Heights neighborhood. CT 1-12. However, Burnett stated that they
17 drove to an apartment to check on Omar's baby, who was sick, and that once they
18 checked on the baby, they returned home. *Id*. Burnett told Detective McClatchy
19 that he and Omar returned home between midnight and 1 a.m. and that they did
20 not go out again. CT 37-38. Shortly after the interview, Burnett was arrested and
21 charged with murder. RT 252.

22 On November 1, 1996, an information was filed in Sacramento Superior
23 Court charging Burnett with violation of California Penal Code section 187 for
24 first degree murder and sections 664/187 for attempted murder. CAT 8-10. The
25 information also contained special allegations that Burnett personally used a
26 firearm in the commission of the charged offenses and that he intentionally killed
27 the victim by firing from a motor vehicle. *Id*. Burnet pleaded not guilty and
28 denied the special allegations. CAT 133.

The jury trial commenced on March 31, 1997. CAT 112-13. On April 10, 1997, a jury returned a guilty verdict on both counts and found the special allegations to be true. CAT 202-03. Burnett was sentenced to state prison for life without possibility of parole on the murder count, and was sentenced to twelve years and four months for consecutive terms for the attempted murder count and special allegations enhancements. CAT 236-37. Burnett appealed his conviction, which the court of appeal affirmed and the California Supreme Court declined to review.

On October 13, 1999, Burnett filed a petition for writ of habeas corpus in the Sacramento Superior Court, which was denied. Both the state court of appeal and the California Supreme Court denied the petition. On March 9, 2001, Petitioner filed the petition pending before this court.

## LEGAL STANDARD

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a district court may grant a petition challenging a state conviction or sentence with respect to a claim that was "adjudicated on the merits" in state court only if it (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Woodford v. Visciotti*, 537 U.S. 19, 21 (2002) (per curiam).

"Clearly established federal law" consists of "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 70-73 (2003). A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a

set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  A state court's decision is an "unreasonable application" of clearly established federal law where "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413.  "[A] federal habeas court may not issue a writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must be objectively unreasonable." *Id*. at 411.

Habeas relief is also available if the state court's adjudication of a claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court." § 2254(d)(2).  "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2)." *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## DISCUSSION

### I.   Claim One: Insufficient Evidence

Burnett claims that the evidence presented at trial was insufficient to support his conviction for first degree murder.

In determining whether evidence was sufficient to support a conviction, a federal court must uphold the conviction if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  If conflicting inferences are supported by the record, a court "must presume . . . that the trier of fact resolved any such conflicts

in favor of the prosecution, and must defer to that resolution." *Id*. at 326.

Federal courts must look to state law for the substantive elements of an offense. *Id.* at 324 n.16. In California, murder is "'an unlawful killing of a human being . . . with malice aforethought.'" *People v. Romero*, 187 P.3d 56, 69 (Cal. 2008) (quoting Cal. Penal Code § 187). Section 189 of the California Penal Code defines first degree and second degree murder:

> All murder which is perpetrated by means of a destructive device or explosive, a weapon of mass destruction, knowing use of ammunition designed primarily to penetrate metal or armor, poison, lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing, or which is committed in the perpetration of, or attempt to perpetrate, arson, rape, carjacking, robbery, burglary, mayhem, kidnapping, train wrecking, or any act punishable under Section 206, 286, 288, 288a, or 289, or any murder which is perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict death, is murder of the first degree. All other kinds of murders are of the second degree.

Cal. Penal Code § 189.

Burnett argues that the evidence presented at trial was insufficient to show that Burnett's murder of Lopa was "premeditated" or "deliberate." However, under the language of section 189, the prosecution did not need to produce any evidence of deliberation or premeditation on Burnett's part in order to secure a conviction for first degree murder.

As an alternative to proving that Burnett committed a murder that was "willful, deliberate, and premeditated," the prosecution could prove first degree murder by producing evidence that Burnett committed a murder "by means of discharging a firearm from a motor vehicle, intentionally at another person outside the vehicle with the intent to inflict death." Under this portion of section 189, there is no requirement of premeditation, but "a specific intent to kill is required. And, as is well established, proof of an unlawful intent to kill is the functional equivalent of express malice." *People v. Chavez*, 12 Cal. Rptr. 3d 832, 842 (Cal. Ct. App. 2004). Thus, the issue in this case is whether there was sufficient

evidence for a reasonable trier of fact to conclude that in the early morning hours of July 24, 1996, Burnett intentionally fired his weapon at Lopa with the specific intent to kill him. *See People v. Rodriguez*, 77 Cal. Rptr. 2d 676, 680 n.5 (Cal. Ct. App. 1998).

Burnett asserts that the evidence in this case "merely shows that two young men drove down a street and fired some shots in the direction of three other young men who were probably members of the Crips gang." Opening Brief at 22. While Burnett concedes the jury was presented with "strong circumstantial evidence" that he "was the passenger in the gray truck," *id.*, Burnett contends there was insufficient evidence of his specific intent to kill Lopa.

Burnett overlooks the inference that the jury was permitted to draw from the "strong circumstantial evidence" that Burnett was the shooter. The California Supreme Court has recognized that "the act of purposefully firing a lethal weapon at another at close range gives rise to an inference of intent to kill." *People v. Smith*, 124 P.3d 730, 736 (Cal. 2005).

In this case, the jury heard strong circumstantial evidence that Burnett fired a gun at close range from the gray truck, killing Lopa. The jury heard testimony from Lene and Tooto that the passenger of the gray truck fired the weapon. Lene and Tooto gave a general description consistent with Burnett's appearance. The jury heard testimony that Lene, shortly after the murder, participated in a photo line-up where he identified Burnett as the possible shooter. The jury heard testimony that Burnett admitted to driving through the Del Paso Heights neighborhood in a gray truck with a camper around the time of the murder. The jury also heard testimony from Keith Henderson that only hours after the shooting, he was driving in a car with Burnett and Omar, during which he overheard a conversation between Burnett and Omar about one of them shooting somebody the previous night. RT 168-70. The jury also heard testimony that the fatal bullet that hit Lopa was shot at close range, from three to five feet away. RT 259-60.

Further, while the jury's inference of specific intent to kill is not contingent upon an additional showing of any particular motive to kill the victim, "where motive is shown, such evidence will usually be probative of proof of intent to kill." *Id*. at 741-42.

In this case, the prosecution presented evidence of Burnett's motive to kill Lopa. Burnett concedes there is "strong circumstantial evidence that the shooting was gang related." Opening Brief at 22. The jury heard evidence that Burnett was associated with the Elm Street Bloods or Del Paso Heights Bloods, that the Bloods claimed Del Paso Heights as their neighborhood, that the three boys were walking through Del Paso Heights at the time of the murder, that the Bloods are gang rivals with the Crips, that the Crips wear blue to identify themselves, and that at the time of the murder, Lopa was wearing blue. The jury also heard testimony from a gang expert who testified that if someone who was a Crip or believed to be a Crip enters an area controlled by the Bloods, it would be interpreted as an act of disrespect, which would likely cause friction, including the use of deadly force. RT 274-78. Thus, such evidence of Burnett's motive to kill Lopa was probative of Burnett's intent to kill.

Burnett contends that the facts favor him because he did not actually exit the vehicle and shoot the boys or "finish off the victims." Reply Brief at 4. But the California Supreme Court has stated that "the circumstance that the bullet misses its mark or fails to prove lethal [is not] dispositive—the very act of firing a weapon in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill." *Id*. at 742 (internal quotation marks omitted). As a result, Burnett's failure to "finish off" Lopa is not dispositive of his intent and does not detract from the inference of specific intent that a jury can draw from the act of purposefully firing a lethal weapon at another human being at close range.

*People v. Gutierrez*, 18 Cal. Rptr. 2d 371 (Cal. Ct. App. 1993)  is

instructive. In *Gutierrez*, Marisela Mercado, a member of the Gardena 13 Gang, was walking home from a carnival with several friends, including Jaime Alvarez, who was not a gang member. *Id.* at 373. Mercado was wearing distinctive gang clothing. *Id*. While walking through an area controlled by the Gardena 13 Gang, Robert Arthur Gutierrez and Antonio Rosales Ambriz, both members of a violent rival gang known as the South Los Gang, pulled up next to Mercado in a van. *Id*. at 373-74. Ambriz jumped out of the van and from about four feet away, opened fire on Mercado, Alvarez, and another companion. *Id*. at 374. Alvarez died from his wounds and Mercado was shot in the leg. *Id*. A jury found Ambriz and Gutierrez guilty of first degree murder and attempted murder. *Id*. at 375.

On appeal, Ambriz and Gutierrez argued the jury did not have sufficient evidence of intent to kill to convict them of murder. The court of appeal found this argument meritless, concluding that

> the jury could have reasonably found: (1) in driving by the victims three times appellant was stalking them; (2) appellant knew he was in Gardena 13 territory; (3) appellant believed the three people standing on the corner waiting for the signal to change were rival gang members; (4) appellant, by firing five shots at close range, hitting two victims and missing one, intended to kill all three; and (5) appellant demonstrated consciousness of guilt by his flight, discarding of the murder weapon, and efforts to fabricate a defense.

*Id.* at 377.

The facts of *Gutierrez* are not identical, but are similar to those in this case. As in *Gutierrez*, evidence was presented that Burnett and Omar drove by the three boys, giving them "hard looks," before they turned the truck around and drove up behind them and started shooting. The jury was presented with evidence that the boys were in Blood territory. The jury heard testimony that Lopa was wearing blue, the color worn by the Crips, and that Lene was associated with a gang. The jury heard testimony that Lopa was shot from a distance of three to five feet. *See Hicks v. Feiock*, 485 U.S. 624, 629-30 n.3 (1988) (observing that a state appellate court's determination of state law is binding and must be given deference).

After viewing the evidence in the light most favorable to the prosecution, the court concludes that a rational trier of fact could have found the essential element of specific intent to kill beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. As a result, Burnett's claims for reversal of the special circumstance findings for lack of insufficient evidence of intent to kill are moot.

## II.  Claim II:  Improper Jury Instruction

Next, Burnett argues that the trial court erred by using CALJIC No. 2.90 as the reasonable doubt jury instruction. CALJIC No. 2.90 states:

> A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether [his] [her] guilt is satisfactorily shown, [he] [she] is entitled to a verdict of not guilty. This presumption places upon the People the burden of proving [him] [her] guilty beyond a reasonable doubt.
>
> Reasonable doubt is defined as follows: It is not a mere possible doubt; because everything relating to human affairs is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge.

CALJIC 2.90.

Burnett argues that the instruction's definition of "reasonable doubt" is confusing and violates the Due Process Clause of the United States and California Constitutions by allowing jurors to find reasonable doubt on a subjective basis. In particular, Burnett disputes the language "feel an abiding conviction," which he views as referring to, or being open to interpretation as referring to, a lesser standard of proof than required by the Due Process Clause.[1]

---

[1] Burnett has asserted claims under the California Constitution, both as to the jury instruction and as to the nature of his punishment (*see infra* Part III), but these claims are not cognizable on federal habeas review. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United

1    The U.S. Supreme Court, however, has upheld the constitutionality of the
language of CALJIC No. 2.90, which defined reasonable doubt as the absence of
"an abiding conviction to a moral certainty, of the truth of the charge." *Victor v.
Nebraska*, 511 U.S. 1, 8-23 (1994). CAT 159. In *Victor*, the Court concluded that
"[a]n instruction cast in terms of an abiding conviction as to guilt, without
reference to moral certainty, correctly states the government's burden of proof."
*Id*. at 14-15.

   Accordingly, Burnett's CALJIC No. 2.90 claim fails.

**III.   Claim III: Cruel and Unusual Punishment**

   Finally, Burnett argues that being sentenced to life without the possibility of
parole, plus the additional consecutive sentences, violates the U.S. Constitution's
and the California Constitution's proscriptions against cruel and unusual
punishment. Specifically, he argues that since he was only 19-years old at the time
of the crime, had only a modest juvenile criminal record, and was "a victim of
circumstances" as a result of growing up in a gang-infested neighborhood, his
sentence was grossly disproportionate.

   "A punishment is excessive under the Eighth Amendment if it involves the
'unnecessary and wanton infliction of pain' or if it is 'grossly out of proportion to
the severity of the crime.'" *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). The
"precise contours" of the disproportionality principle are "unclear," but the
principle applies "only in the exceedingly rare and extreme case." *Lockyer*, 538
U.S. at 73 (internal quotation marks omitted). Thus, this court must decide
whether the California Court of Appeal's decision affirming Burnett's sentence
was "contrary to, or involved an unreasonable application of," the gross
disproportionality principle. *See id.*

   "The Eighth Amendment does not require strict proportionality between

---

States.").

crime and sentence. Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Harmelin v. Michigan*, 501 U.S. 957,1001 (1991) (quoting *Solem v. Helm*, 463 U.S. 277, 288, 303 (1983)). In general, a court examines three factors to determine if a sentence is disproportionate: "[1] the gravity of the offense and the harshness of the penalty; [2] the sentences imposed on other criminals in the same jurisdiction, that is, whether more serious crimes are subject to the same penalty or to less serious penalties; and [3] the sentences imposed for commission of the same crime in other jurisdictions." *Solem*, 463 U.S. at 278, 290-92. If a comparison of the gravity of the offense with the harshness of the sentence does not raise an inference of gross disproportionality, a court need not consider the other factors. *See Harmelin*, 501 U.S. at 1005-06.

In looking at the first factor, courts examine the "harm caused or threatened to the victim or society and the culpability of the offender." *Solem*, 463 U.S. at 292. Relevant factsors are "whether the crime was violent in nature and whether the offense was directed at a person or at property." *Cocio v. Bramlett*, 872 F.2d 889, 892 (9th Cir. 1989). The defendant's state of mind is also relevant: "Intentional acts are more reprehensible than reckless acts. Reckless acts are more serious than negligent acts." *Id*.

In this case, Burnett was convicted of a very serious violent offense, involving the murder of another human being. Further, the victim, Feolofan Lopa, was just a boy—only 16-years old—at the time of his death. RT 258. Lopa did nothing to provoke Burnett. Lopa was merely walking home, after spending an enjoyable evening with his friends and family. When Burnett and his accomplice first confronted the boys, the boys tried to avoid a situation by ignoring their taunts and minding their own business. Nevertheless, Burnett and his accomplice still chased after the three boys, and Burnett opened fire from the vehicle on all three boys at a close range.

Burnett's sentence is not unreasonable in light of Supreme Court decisions

finding far less grievous crimes to be serious offenses meriting the same type of sentence. In *Rummel v. Estelle*, for example, the petitioner was sentenced to life in state prison under a state recidivist statute, which provided that "[w]hoever shall have been three times convicted of a felony less than capital shall on such third conviction be imprisoned for life in the penitentiary." 445 U.S. 263, 264 (1980). The petitioner's first conviction was for the fraudulent use of a credit card to acquire $80 worth of goods or services. *Id*. at 265. His second conviction was for passing a forged check in the amount of $28.36. *Id*. His third conviction, which triggered the recidivist statute, was for obtaining $120.75 by false pretenses. *Id*. at 266. The U.S. Supreme Court rejected the petitioner's argument that his life imprisonment violated the Eighth Amendment because it was "grossly disproportionate" to the three felonies that formed the predicate for his sentence.

In *Harmelin v. Michigan*, the petitioner was sentenced to a mandatory term of life in prison without possibility of parole for possessing 672 grams of cocaine. 501 U.S. at 961. Even though the petitioner had no prior felony convictions, the Supreme Court rejected the petitioner's claim that his sentence constituted cruel and unusual punishment in violation of the Eighth Amendment. *Id.* at 994-96.

Burnett's violent crime is far more serious than the crimes at issue in *Rummel* and *Harmelin*, where the Supreme Court found a sentence of life without the possibility of parole to be constitutionally sound. Burnett committed murder, and, as the Ninth Circuit has observed, "[u]nder *Harmelin*, it is clear that a mandatory life sentence for murder does not constitute cruel and unusual punishment." *United States v. LaFleur*, 971 F.2d 200, 211 (9th Cir. 1991) (rejecting argument that it is cruel and unusual punishment for a life sentence to be imposed without the consideration of mitigating factors in non-capital cases). Therefore, Burnett has failed to raise an inference of gross disproportionality under controlling precedent. *See also Ewing v. California*, 538 U.S. 11, 29 (2003) (holding sentence for 25 years to life under California's Three Strikes law based

1 upon conviction for theft of three golf clubs was not grossly disproportionate and
2 did not violate the Eighth Amendment); *Lockyer*, 538 U.S. at 76-77 (holding
3 sentence for 25 years to life under California's Three Strikes law for stealing $153
4 in video tapes was not grossly disproportionate and did not violate the Eighth
5 Amendment).

6 Further, Burnett's sentence does not exceed the statutory maximum for the
7 crime of which he was convicted. Section 190.2, subdivision (a), of the California
8 Penal Code provides "[t]he penalty for a defendant who is found guilty of murder
9 in the first degree is death or imprisonment in the state prison for life without the
10 possibility of parole if one or more . . . special circumstances has been found,"
11 including "[t]he murder was intentional and perpetrated by means of discharging a
12 firearm from a motor vehicle, intentionally at another person or persons outside
13 the vehicle with the intent to inflict death." "Generally, so long as the sentence
14 imposed does not exceed the statutory maximum, it will not be overturned on
15 eighth amendment grounds." *United States v. McDougherty*, 920 F.2d 569, 576
16 (9th Cir. 1990); *see also United States v. Meiners,* 485 F.3d 1211, 1213 (9th Cir.
17 2007) (per curiam) ("The Supreme Court has repeatedly emphasized that 'federal
18 courts should be reluctant to review legislatively mandated terms of imprisonment,
19 and that successful challenges to the proportionality of particular sentences should
20 be exceedingly rare.'" (quoting *Ewing*, 538 U.S. at 22)); *United States v.
21 Mejia-Mesa*, 153 F.3d 925, 930 (9th Cir. 1998) ("punishment within legislatively
22 mandated guidelines is presumptively valid"). This factor also militates against
23 overturning Burnett's sentence as a violation of the Eighth Amendment.

24 As a result, the court finds that Burnett's sentence of life imprisonment
25 without the possibility of parole for first degree murder does not present an
26 "exceedingly rare" case amounting to a violation of the gross disproportionality
27 principle. *See Lockyer*, 538 U.S. at 73-77.

28 **CONCLUSION**

1    It is hereby ORDERED that Burnett's petition for a writ of habeas corpus is
2 DENIED.  The Clerk is directed to enter judgment and close the case.

4 DATED: March 30, 2010

6                                        /s/ Milan D. Smith, Jr.
7                                        UNITED STATES CIRCUIT JUDGE
8                                        Sitting by Designation