IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

Carlos R. Burnett,

    Petitioner,                                No. 2:01:cv-00481-MDS

  vs.                                        <u>ORDER</u>

Ken Clark, Warden,

    Respondent.

_____/

Petitioner Carlos R. Burnett, a state prisoner, has filed a petition for a writ of habeas corpus with this court pursuant to 28 U.S.C. § 2254(a). For the reasons discussed below, Burnett's petition is DENIED.

**FACTS AND PROCEEDINGS**

In the early morning hours of July 24, 1996, three teenage boys named Feolofan Lopa, Matthew Lene, and Jesse Tooto, started walking to Lene's home in North Sacramento after spending the evening at the home of Lene's aunt. RT 37-43, 73-75. Their journey home took them through the neighborhood of Del Paso Heights.

Del Paso Heights is a large neighborhood in North Sacramento, and Elm Street is located within Del Paso Heights. RT 273. At the time of the events in this

case, each of these geographical areas was associated with a specific street gang. The Del Paso Heights Bloods claimed the Del Paso Heights neighborhood as their territory, and the Elm Street Bloods claimed Elm Street and the associated block as their territory. RT 275. The Del Paso Heights and Elm Street Bloods were related gangs, as they were both subsets of the larger Bloods gang. RT 273-75.

The Bloods often engage in violent conflict with the Crips, a rival gang. RT 274-75. Both gangs have their own signs, hand signs, and graffiti to identify their members. *Id*. They also distinguish themselves from one another by the colors they wear—Crips typically wear blue, and Bloods tend to wear red. RT 273.

On the morning of July 24, Lopa was wearing blue clothing. RT 76-77. The record is not clear whether the three boys belonged to a gang. Lene testified that he "grew up with a street gang" called the Sons of Samoa, RT 38-39, whose members tended to wear blue, RT 39-40, but he declined to say whether the Sons of Samoa associated themselves with the Crips or Bloods. RT 39. Lene also did not address Lopa's or Tooto's involvement with the Sons of Samoa. RT 38.

As the three boys walked together, two African-American males in a gray pickup truck with a camper shell drove slowly past the boys, giving them "hard looks." RT 76-77. The driver shortly turned the truck around, parked, and exited the vehicle with the passenger. RT 43-45, 77. The driver yelled, "What's up, Bloods?" RT 45, 77. The three boys did not respond to the driver's taunt and continued walking. RT 46, 77.

After the two drivers initially passed the three boys and parked the car, Lene was able to briefly look at them after the two men exited the truck. Lene saw that the driver was a skinny African-American male with braided hair. RT 48-49. Lene observed that the passenger was a tall, skinny African-American male with little or no hair. RT 49-50. Tooto also got a look at the two men as they slowly drove past the boys, giving them "hard looks." He described the driver as an African-American male who was "kind of chubby and stocky" with braided hair. RT 85-86.

He described the passenger as a tall, skinny African-American male who was bald or had little hair. RT 87.

Suddenly, the truck pulled up behind the boys. RT 50, 79. The passenger shouted, "What's up now, Blood," and then began firing at the boys. RT 50-51, 55, 80-81. Lene was hit in his left thigh, RT 56-57, 81-82, and Lopa was shot in the back, RT 58-59. Lopa died from the gunshot wound. RT 258-60.

After the incident, Lene participated in a photo line-up at the police station. RT 60-62. Lene was shown ten photos in the photo line-up, and he pointed out two that resembled the shooter, one of whom was Burnett. RT 59-64. Tooto also participated in a photo lineup. RT 99-100. When Tooto was shown a group of ten photographs, he eventually picked a photograph that he believed resembled the passenger. The photograph he selected was not of Burnett. RT 90-92, 100-01.

After Lene identified Burnett as being the possible shooter, Sharon McClatchy, a detective with the Sacramento City Police Department, interviewed Burnett. RT 247-48, CT 1-48. In that interview, Burnett represented that on the night of the shooting, he and his friend, Omar, drove a gray truck with a camper in the Del Paso Heights neighborhood. CT 1-12. However, Burnett stated that they drove to an apartment to check on Omar's baby, who was sick, and that once they checked on the baby, they returned home. *Id*. Burnett told Detective McClatchy that he and Omar returned home between midnight and 1 a.m. and that they did not go out again. CT 37-38. Shortly after the interview, Burnett was arrested and charged with murder. RT 252.

On November 1, 1996, an information was filed in Sacramento Superior Court charging Burnett with violation of California Penal Code section 187 for first degree murder and sections 664/187 for attempted murder. CAT 8-10. The information also contained special allegations that Burnett personally used a firearm in the commission of the charged offenses and that he intentionally killed the victim by firing from a motor vehicle. *Id*. Burnet pleaded not guilty and denied the special

allegations. CAT 133.

The jury trial commenced on March 31, 1997. CAT 112-13. On April 10, 1997, a jury returned a guilty verdict on both counts and found the special allegations to be true. CAT 202-03. On May 8, 1997, the trial court sentenced Burnett to state prison for life without possibility of parole on the murder count, and to twelve years and four months for consecutive terms for the attempted murder count and special allegations enhancements. CAT 236-37. On June 30, 1998, the California Court of Appeal of the Third Appellate District affirmed Burnett's conviction. On September 23, 1998, the California Supreme Court denied Burnett's petition for review.

On October 13, 1999, Burnett filed a petition for writ of habeas corpus in the Sacramento County Superior Court. On November 3, 1999, the state court denied the petition. On November 29, 1999, Burnett filed a petition for writ of habeas corpus in the California Court of Appeal for the Third Appellate District. On December 2, 1999, the California Court of Appeal summarily denied the petition. On March 13, 2000, Burnett filed a petition for writ of habeas corpus with the California Supreme Court. On June 28, 2000, the California Supreme Court summarily denied the petition.

On March 9, 2001, Burnett filed the present petition for writ of habeas corpus. Burnett filed an amended petition for writ of habeas corpus on January 16, 2008.

## LEGAL STANDARD

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a district court may grant a petition challenging a state conviction or sentence with respect to a claim that was "adjudicated on the merits" in state court only if it (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "resulted in a decision that was based on an unreasonable determination of

the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Woodford v. Visciotti*, 537 U.S. 19, 21 (2002) (per curiam).

"Clearly established federal law" consists of "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A state court's decision is an "unreasonable application" of clearly established federal law where "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. "[A] federal habeas court may not issue a writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must be objectively unreasonable." *Id*. at 411.

Habeas relief is also available if the state court's adjudication of a claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in" state court. 28 U.S.C. § 2254(d)(2). "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2)." *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

Generally, *Strickland v. Washington*, 466 U.S. 668 (1987), governs claims of ineffective assistance of counsel. For relief to be granted under *Strickland*, a

5

petitioner must prove 1) that counsel's "'representation fell below an objective standard of reasonableness'" and, 2) that "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Bell v. Cone*, 535 U.S. 685, 695 (2002) (quoting *Strickland*, 466 U.S. at 688, 694).

In assessing counsel's performance, courts must defer to the reasonable professional judgment of a trial counsel and presume that counsel's conduct falls within a "wide range" of "reasonable" professional representation. *Id*. at 702. "The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986); *see also Hendricks v. Calderon*, 70 F.3d 1032, 1036 (9th Cir. 1995) ("[U]nder the rule of contemporary assessment, an attorney's actions must be examined according to what was known and reasonable at the time the attorney made his choices."). To meet his burden of showing prejudice, Burnett must affirmatively "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *see also Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993) (noting that the "prejudice" component "focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair").

## DISCUSSION

**I.    Claim One: The conviction must be reversed due to a violation of Burnett's Sixth Amendment right to the effective assistance of trial counsel because counsel failed to withdraw despite an irreconcilable conflict.**

Burnett argues that he was denied his right to effective assistance of counsel because his attorney did not move to withdraw due to an irreconcilable conflict.

1  Specifically, Burnett contends that his trial counsel wanted more time to prepare for
2  trial, while Burnett refused to postpone the trial any longer.  Burnett contends that
3  "[b]y staying in the case despite his [counsel's] professional belief that he needed
4  more time to prepare the defense, trial counsel served as counsel in only the most
5  superficial sense."

6      Burnett is essentially arguing that his counsel proceeded to trial even though
7  he was unprepared.  But the record reveals that Burnett's counsel was
8  well-informed of his client's case, that he ably argued his client's defense, and that
9  he competently examined the witnesses.  Further, Burnett has failed to point to any
10 specific examples demonstrating his counsel's lack of preparation.  It is Burnett's
11 burden to overcome the "strong presumption" that his counsel "rendered adequate
12 assistance and made all significant decisions in the exercise of reasonable
13 professional judgment."  *Strickland*, 466 U.S. at 689-90.  To do so, Burnett needs to
14 identify the acts or omissions that allegedly rendered the representation objectively
15 unreasonable.  *Id.* (observing that "[t]he availability of intrusive post-trial inquiry
16 into attorney performance or of detailed guidelines for its evaluation would
17 encourage the proliferation of ineffectiveness challenges" as well as "dampen the
18 ardor and impair the independence of defense counsel, discourage the acceptance of
19 assigned cases, and undermine the trust between attorney and client").  Here,
20 Burnett's mere conclusory allegation that trial counsel failed to investigate or
21 prepare is insufficient to show that his counsel's representation was deficient.  *See*
22 *Eggleston v. United States*, 798 F.2d 374, 376 (9th Cir. 1986) (holding the record
23 showed that the petitioner's counsel was well informed of the facts and
24 circumstances of the case).

25     Further, Burnett has not demonstrated how he was prejudiced by his counsel
26 proceeding to trial when he did.  Burnett has not explained what new counsel would
27 have done for Burnett that his trial counsel was unable to do or did not do himself.
28 Burnett's conclusory allegations that new counsel *might* have been able to provide a

more effective representation are insufficient to prove that counsel was ineffective. *See Shah v. United States*, 878 F.2d 1156, 1161 (9th Cir. 1989) (holding the petitioner's allegation that his counsel improperly advised him was vague and conclusory); *see also Villafuerte v. Stewart*, 111 F.3d 616, 630-32 (9th Cir. 1997) (rejecting petitioner's ineffective assistance claim where he presented no evidence concerning what counsel would have found had he interviewed a witness or investigated further); *Ceja v. Stewart*, 97 F.3d 1246, 1255 (9th Cir. 1996) (holding there was no ineffective assistance of counsel where the petitioner failed to explain "what compelling evidence additional interviews would have unearthed or to explain how an investigation of aggravation evidence would have negated the evidence of the multiple gunshot wounds"). A habeas petitioner "is expected to state facts that point to a real possibility of constitutional error." *Wacht v. Cardwell*, 604 F.2d 1245, 1247 (9th Cir. 1979) (internal quotation marks omitted). In sum, Burnett has failed to provide this court with sufficient detail about what his trial counsel did wrong as a result of his lack of preparation, or what his substituted counsel would have done better with more preparation, so as to enable the court to determine whether Burnett's first claim raises a "real possibility" of constitutional error and warrants further habeas review. *See Cox v. Del Papa*, 542 F.3d 669, 681 (9th Cir. 2008) ("Without any specification of the mitigating evidence that counsel failed to unearth, Cox's [IAC] claim must fail."); *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations . . . [un]supported by a statement of specific facts do not warrant habeas relief.").

As a result, Burnett has failed to carry his burden under *Strickland* as to his first claim.

**II.  Claim Two: The conviction must be reversed due to a violation of Burnett's Sixth Amendment right to the effective assistance of trial counsel because counsel failed to have Burnett examined for his competency to stand trial.**

Burnett argues that he was denied effective assistance of counsel because his

counsel failed to seek a competency hearing or request that Burnett undergo a psychiatric evaluation. He asserts that his counsel should have done so after Burnett informed him that he had experimented with PCP in the months prior to his case and had consequently suffered paranoid schizophrenic symptoms. He also contends that his counsel should have been alerted to his competency problems when Burnett insisted on rushing to trial, contrary to his counsel's desire to take more time to prepare for trial.

It is well established that the conviction of a legally incompetent defendant violates the Due Process Clause of the Fourteenth Amendment. *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996). In federal court, a defendant is competent to stand trial if he has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and has a rational as well as factual understanding of the proceedings against him." *Godinez v. Moran*, 509 U.S. 389, 396 (1993) (internal quotation marks omitted). In California, "[a] defendant is mentally incompetent . . . [if] the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." Cal. Pen. Code § 1367; *see also Nguyen v. Garcia*, 477 F.3d 716, 724 (9th Cir. 2007) (equating competency standard articulated in section 1367 with the standard applied by the Supreme Court in *Godinez v. Moran*, 509 U.S. 389, 401 n.12 (1993)). California law "presume[s] that the defendant is mentally competent unless it is proved by a preponderance of the evidence that the defendant is mentally incompetent." Cal. Pen. Code § 1369(f).

Burnett's counsel had a duty to request a competency hearing if he harbored "substantial doubt" about Burnett's competency to stand trial. *See, e.g.*, *Boag v. Raines*, 769 F.2d 1341, 1343 (9th Cir. 1985) ("In a habeas proceeding, a petitioner is entitled to an evidentiary hearing on the issue of competency to stand trial if he presents sufficient facts to create a real and substantial doubt as to his competency, even if those facts were not presented to the trial court."); *People v. Farnam*, 47

P.3d 988, 1056 (Cal. 2002) (rejecting claim that counsel was ineffective for failing to raise competency issue where "nothing in the record raised a substantial doubt as to competency"). A "substantial doubt" exists in this regard "when there is substantial evidence of incompetence." *Deere v. Woodford*, 339 F.3d 1084, 1086 (9th Cir. 2003) (internal quotation marks omitted). Burnett has the burden of establishing his mental incompetence to stand trial. *See McKinney v. United States*, 487 F.2d 948, 949 (9th Cir. 1973) ("[W]hen the issue of the defendant's competency to stand trial is raised in a § 2255 motion, the burden is upon the defendant to prove that he was not mentally competent to stand trial."). Whether a defendant is capable of understanding the proceedings and assisting counsel depends on "evidence of the defendant's irrational behavior, his demeanor in court, and any prior medical opinions on competence to stand trial." *Drope v. Missouri*, 420 U.S. 162, 180 (1975); *see also Williams v. Woodford*, 306 F.3d 665, 702 (9th Cir. 2002).

The court cannot glean from the record or from the reasons provided by Burnett why his trial counsel would have harbored substantial doubt as to Burnett's competency to stand trial. There is no indication in the record that counsel on either side, or the trial judge, ever expressed a doubt as to Burnett's competency to stand trial. *See Hernandez v. Ylst*, 930 F.2d 714, 718 (9th Cir. 1991) ("We deem significant the fact that the trial judge, government counsel, and Hernandez's own attorney did not perceive a reasonable cause to believe Hernandez was incompetent."); *United States v. Lewis*, 991 F.2d 524, 528 (9th Cir. 1993) (stating that a defense counsel's silence on the petitioner's competency is "some evidence" that the petitioner showed no signs of incompetence at that time).

The reasons Burnett has provided are either unpersuasive or uncorroborated. The fact that Burnett, who was 19-years old at the time, might differ with his counsel as to the timing of the trial is hardly surprising. And there is no evidence that Burnett's alleged drug experimentation a few months prior to his case, of which

there is likewise no evidence, would affect his ability to stand trial months later. Burnett does not claim that he was taking any drugs or medications during the course of the trial. Even if he was taking medications or drugs around the time of the trial, Burnett would still need to produce evidence, not conclusory assertions, of how those medications or drugs affected his competency at trial, which Burnett has not done here beyond a bare allegation that he was suffering from "paranoid schizophrenic symptoms" at some unspecified time. *See Sturgis v. Goldsmith*, 796 F.2d 1103, 1109-10 (9th Cir. 1986) (failure to present evidence of medication petitioner was taking or "how [the medication] might have affected his competence at trial" failed to raise a *bona fide* doubt as to the petitioner's competency to stand trial); *United States v. Williams*, 998 F.2d 258, 267 (5th Cir. 1993) ("Even if true, the bare allegation that he has seen a psychiatrist and taken psychotropic medication, without more, would not suffice to establish reasonable grounds to believe that Williams might be so mentally compromised as to be unable to understand trial proceedings or to assist in his own defense."). Otherwise, Burnett has not provided the court with declarations or affidavits from a physician discussing his medical history or any medical records, which might substantiate that there should have been some indication that Burnett was unable to understand the nature of the criminal proceedings or to assist his counsel in the conduct of a defense in a rational manner. *Cf.*, *Moore v. United States*, 464 F.2d 663, 665 (9th Cir. 1972) (defendant had "an extensive history of mental illness," which included repeated hospitalization for psychiatric disorders, suicide attempts, and hallucinations). Nor has Burnett presented the court with any evidence of his exhibiting erratic or irrational behavior during the course of the trial. *Cf.*, *Tillery v. Eyman*, 492 F.2d 1056, 1057-58 (9th Cir. 1974) (defendant screamed throughout the nights from his jail cell, laughed at the jury, made gestures at the bailiff, disrobed in the courtroom, and butted his head through a glass window). Burnett's claim is especially tenuous in light of his own acknowledgment that his conversations with

his counsel during the court proceedings did not indicate that Burnett had any psychological problems. Lodgement No. 9 at 14.

Accordingly, Burnett has failed to show that his trial counsel's failure to request a competency examination or hearing "'fell below an objective standard of reasonableness.'" *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 688). As a result, Burnett has failed to carry his burden under *Strickland* as to his second claim.

### III. Ground Three: The conviction must be reversed due to a violation of Burnett's Sixth Amendment right to the effective assistance of trial counsel because counsel failed to investigate any mental health defenses.

Burnett argues that his "trial counsel had actual and constructive knowledge that Mr. Burnett may have had mental health problems." This notice came in the form of Burnett informing his counsel that he was suffering from "paranoid schizophrenic symptoms at the time of the shooting" and Burnett "rejecting counsel's professional advice to waive [the] Speedy Trial Act time so that counsel could prepare a defense." As a result, Burnett contends his counsel had a duty to investigate and pursue a mental health defense.

A defense attorney has a general duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. *See Strickland*, 466 U.S. at 690-91. The duty of reasonable investigation extends to the issue of mental health. *See Raley v. Ylst*, 470 F.3d 792, 800-801 (9th Cir. 2006) (discussing counsel's obligation to investigate mental health for purposes of ascertaining viability of mental defenses at trial); *Douglas v. Woodford*, 316 F.3d 1079, 1085 (9th Cir. 2003) ("Trial counsel has a duty to investigate a defendant's mental state if there is evidence to suggest that the defendant is impaired.").

However, where the decision not to investigate further is taken because of reasonable tactical evaluations, the attorney's performance is not constitutionally

deficient. *Siripongs v. Calderon*, 133 F.3d 732, 734 (9th Cir. 1998). For example, in *Bean v. Calderon*, the Ninth Circuit rejected a claim that defense counsel was ineffective for failing to pursue a diminished capacity defense. 163 F.3d 1073, 1082 (9th Cir. 1998). The court noted that in light of the defendant's own assertion of where he was at the time of the crime, his defense counsel had made a reasonable strategic choice to present an alibi defense. *Id*. Most importantly, the pursuit of a diminished capacity defense would have conflicted with the alibi defense. *Id*. Thus, "[o]nce [the defense counsel] reasonably chose that theory, largely on the basis of [his client's] own representations, his duty to investigate the directly conflicting diminished capacity defense was at an end." *Id*.; *see also Williams v. Woodford*, 384 F.3d 567, 611-12 (9th Cir. 2004) (where counsel reasonably selected an alibi defense as the primary defense theory, counsel no longer had a duty to investigate a "conflicting" mental state defense); *Correll v. Stewart*, 137 F.3d 1404, 1411 (9th Cir. 1998) ("Counsel did not have a duty to pursue every possible line of defense where she reasonably did not believe [her client's] interests would be advanced.").

In this case, Burnett asserted an actual innocence defense. Burnett turned himself in to the police and insisted that he had nothing to do with the murder. Lodgement No. 9 at 1-2, 18. Therefore, his counsel's presentation of a mental defense would have conflicted with his primary defense that he was innocent. Further, this is not a case where counsel's failure to investigate led to the presentation of a defense that was "incredibly lame." *Johnson v. Baldwin*, 114 F.3d 835, 838-40 (9th Cir. 1997). Burnett had an alibi of where he was the night of the crime. The prosecution did not have a confession from Burnett nor did it have eyewitness accounts of Burnett committing the murder. All the evidence against Burnett was circumstantial. Thus, Burnett's counsel had reasonable grounds to believe, especially in light of Burnett's assertions that he was innocent, that he could prevail in creating some reasonable doubt in the jury about whether Burnett was the actual shooter. *See Iaea v. Sunn*, 800 F.2d 861, 865 n.4 (9th Cir. 1986) (counsel

13

did not have duty to pursue every possible line of defense where she reasonably did not believe the petitioner's interests would be advanced). Under *Strickland*, the relevant inquiry is not what defense counsel could have pursued, but rather whether the choices made by defense counsel were reasonable. 466 U.S. at 690. The evidence shows that Burnett's counsel's investigation and decision to forego a mental defense was reasonable. *See Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) ("The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight."); *Morris v. California*, 966 F.2d 448, 456-57 (9th Cir. 1991) (stating that if a court can conceive of reasonable tactical purpose for counsel's action or inaction, the court need not determine actual explanation).

As a result, Burnett has failed to carry his burden under *Strickland* as to his third claim.

**IV.   Ground Four:   The conviction must be reversed due to a violation of Burnett's Sixth Amendment right to the effective assistance of trial counsel because counsel failed to move for suppression of the videotape of Burnett's interrogation.**

Burnett argues that his counsel erred by not moving to suppress the videotaped statements made by Burnett, on the ground that it was in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). In *Miranda v. Arizona*, the Supreme Court held that to protect an individual's Fifth Amendment rights, police must advise a suspect of the right to an attorney and to remain silent before they can subject that person to custodial interrogation. 384 U.S. 436, 444 (1966). Nonetheless, even if there was a *Miranda* violation, Burnett must still affirmatively prove prejudice under *Strickland*, showing "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[1]  466 U.S. at 694.

---

[1] The admission of evidence obtained in violation of *Miranda* is subject to harmless error analysis. *United States v. Brobst*, 558 F.3d 982, 996 (9th Cir. 2009); *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (holding that a constitutional error

In this case, even assuming that the police somehow violated Burnett's *Miranda* rights during his taped interrogation, Burnett cannot show ineffective assistance of counsel. Burnett turned himself into the police, at which time he was interrogated by Detective McClatchy. During the interview, Burnett denied being involved with the shooting. Burnett provided the detective with a alibi for what he was doing around the same time the crime occurred. Thus, the interview did not contain any incriminating statements that would have effected or influenced the jury's verdict. Burnett has acknowledged that the prosecution represented in open court that it had no confession from Burnett and that it did not have Burnett's fingerprints. Lodgement No. 9 at 5. In short, Burnett has not demonstrated that the admission of the taped statements would have resulted in prejudice. Therefore, trial counsel's performance was not deficient for failing to file a motion to suppress lacking in merit. *See Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005) ("[T]rial counsel cannot have been ineffective for failing to raise a meritless objection."); *Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) ("[T]he failure to take a futile action can never be deficient performance."). Further, given that the suppression motion would have been futile, there is no reasonable probability that, had the motion been brought, the result of the proceeding would have different. *See Strickland*, 466 U.S. at 693-94.

In sum, a motion challenging the admissibility of Burnett's statements to police on *Miranda* grounds would have been futile. Accordingly, counsel was not ineffective in failing to make such a challenge, and Burnett has failed to carry his

---

is harmless unless the error had a "substantial and injurious effect or influence in determining the jury's verdict"). Nonetheless, in a claim for ineffective assistance of counsel, a court need not conduct a harmless error review under *Brecht* because "'[t]he *Strickland* error analysis is complete in itself; there is no place for an additional harmless-error review.'" *Avila v. Galaza*, 297 F.3d 911, 918 n.7 (9th Cir. 2002) (quoting *Jackson v. Calderon*, 211 F.3d 1148, 1154 n.2 (9th Cir. 2000)).

burden under *Strickland* as to his fourth claim.

**V. Ground Five: The conviction must be reversed due to a violation of Burnett's Sixth Amendment right to the effective assistance of trial counsel because counsel failed to challenge admission of testimony regarding the results of a photo line-up.**

Burnett argues that his counsel "inexplicably failed to move to suppress evidence regarding the surviving victims' pre-trial identification of Mr. Burnett in a photo lineup despite excellent grounds to attack the identification." Burnett's claim refers to the photo lineups the police conducted for Matthew Lene and Jesse Tooto following the shooting.

The Due Process Clause of the Fourteenth Amendment prohibits the use of identification procedures that are "unnecessarily suggestive and conducive to irreparable mistaken identification." *Stovall v. Denno*, 388 U.S. 293, 302 (1967), *overruled on other grounds by Griffith v. Kentucky*, 479 U.S. 314, 326 (1987). In a habeas action, a federal court applies a two-step analysis to evaluate a petitioner's challenge to pretrial and subsequent in-court identifications. *United States v. Givens*, 767 F.2d 574, 581 (9th Cir. 1985). First, the court must determine whether the pretrial identification procedure was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968); *United States v. Montgomery*, 150 F.3d 983, 992-93 (9th Cir. 1998). "An identification procedure is suggestive when it emphasize[s] the focus upon a single individual thereby increasing the likelihood of misidentification." *Id.* at 992 (internal quotation marks omitted) (alteration in original); *see e.g.*, *United States v. Bagley*, 772 F.2d 482, 493 (9th Cir. 1985) ("The repeated showing of the picture of an individual, for example, reinforces the image of the photograph in the mind of the viewer.").

Second, even if the pretrial identification procedure was impermissibly suggestive, the court must decide whether, under the totality of the circumstances, the identification was nonetheless reliable. *Manson v. Brathwaite*, 432 U.S. 98, 114

16

(1977); *Neil v. Biggers*, 409 U.S. 188, 198-200 (1972). The factors to be considered in determining reliability are: (1) the witness's opportunity to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Id.* at 199-200.

Here, Burnett focuses his challenge exclusively on the reliability of the photo lineups, arguing they were unreliable in light of Tooto's and Lene's inability to properly view the shooter and the lack of certainty they demonstrated at the lineups. However, if no unnecessarily suggestive procedures were used, a court need not determine reliability, and admission of the identification does not violate due process. *Bagley*, 772 F.2d at 492 ("If we find that a challenged procedure is not impermissibly suggestive, our inquiry into the due process claim ends."); *United States v. Henderson*, 241 F.3d 638, 651 (9th Cir. 2000) (holding that because the petitioner made no showing that the government's identification procedures were unduly suggestive, the petitioner's *Biggers* challenge failed).

Burnett has not explained how the lineup itself was improperly suggestive. *Cf.*, *Manson v. Brathwaite*, 432 U.S. 98, 108-09 (1977) (holding that exhibiting a single photograph for identification purposes is impermissibly suggestive); *Neil v. Biggers*, 409 U.S. 188, 195 (1972) (finding a show-up was suggestive when detectives called a rape victim to the police station months after the crime, walked the defendant past the victim, and directed the defendant to tell the victim "shut up or I'll kill you"); *Foster v. California*, 394 U.S. 440, 443 (1969) (holding that identification procedures were inherently suggestive where police first arranged a lineup in which "petitioner stood out from the other two men by the contrast of his height and by the fact that he was wearing a leather jacket similar to that worn by the robber"). "Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned

for the further reason that the increased chance of misidentification is gratuitous." *Neil*, 409 U.S. at 197.  But in this case, Burnett has only impugned the victims' ability to identify him, rather than identifying what aspect of the photo lineups enhanced the likelihood of misidentification, thereby violating Burnett's right to due process.

Because Burnett has failed to demonstrate that the photo lineups were unduly suggestive, he cannot show that the admission of the identification violated due process, and the court need not address the reliability of the identification procedure.  *See Bagley*, 772 F.2d at 492.  Further, Burnett's inability to show that there would have been any merit to his counsel's motion to suppress precludes him from prevailing on his ineffective assistance of counsel claim.  *See Knowles v. Mirzayance*, --- U.S. ----, 129 S.Ct. 1411, 1420 (2009) (counsel not "required to pursue every claim or defense, regardless of success"); *id.* at 1422 ("The law does not require counsel to raise every available nonfrivolous defense"); *Rupe*, 93 F.3d at 1445.  Even if Burnett had demonstrated the lineups were unconstitutionally suggestive, Burnett has not demonstrated that the outcome of this case would have been different had the photo lineups been suppressed.

As a result, Burnett has failed to carry his burden under *Strickland* as to his fifth claim.

## CONCLUSION

Having reviewed the record, the court concludes Burnett has not shown it was contrary to, or an unreasonable application of established federal law, for the state court to deny Burnett relief on his claim of ineffective assistance of counsel.  Accordingly, Burnett is not entitled to habeas relief.

It is hereby ORDERED that Burnett's petition for a writ of habeas corpus is DENIED.  The Clerk is directed to enter judgment and close the case.

DATED: April 7, 2010

1 | /s/ Milan D. Smith, Jr.
2 | UNITED STATES CIRCUIT JUDGE
3 | Sitting by Designation